## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHANNON D. LINDSEY,        )
                                   )
        Plaintiff           )
                                   )
        v.                )        3:09cv501
                                   )        **Electronic Filing**
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,   )
                                   )
        Defendant     )

## MEMORANDUM OPINION

July 21, 2010

### I.   INTRODUCTION

Shannon D. Lindsey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f ("Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Document Nos. 10, 12). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is denied; Defendant's Motion for Summary Judgment is granted; and, the decision of the Administrative Law Judge, Donald T. McDougall, ("ALJ") is affirmed.

### II.   PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration ("SSA") on June 7, 2006, claiming an inability to work due to disability as of June 1, 2001. (R. at 73 - 80).[1] Plaintiff was initially denied SSI by the SSA on November 14, 2006. (R. at 47 - 51). Plaintiff filed a request

---

[1] Citations to Document No. 5, the Record, *hereinafter*, "R. at __."

for a hearing by an Administrative Law Judge on January 8, 2007. (R. at 52 - 53).  A hearing was scheduled for February 4, 2008, and Plaintiff appeared before the ALJ represented by Gregory Kunkel, Esquire. (R. at 20 - 44).  A vocational expert, James E. Ganoe, M.P.A., L.P.C., also appeared at the hearing to testify. (R. at 20, 60).  The ALJ issued his decision denying SSI to Plaintiff on July 1, 2008. (R. at 8 - 19).  The Administrative Appeals Council denied Plaintiff's request for review on February 26, 2009, making the decision of the ALJ the final decision of the Commissioner. (R. at 1 - 3).

Plaintiff brought the instant action in this Court by filing her Complaint on April 29, 2009. Defendant filed his Answer on July 13, 2009. Cross-motions for Summary Judgment followed.

## III.  STATEMENT OF THE CASE

In her Motion, Plaintiff's arguments address only issues surrounding the ALJ's determinations with respect to Plaintiff's knee pain - specifically the ALJ's rejection of certain of William J. Mitchell, M.D.'s limitations findings, and Plaintiff's subjective complaints of knee pain corroborated by Dr. Mitchell's treatment records.  This Court's statement of the case will thus be limited to the relevant facts.

Plaintiff was born September 25, 1975, and was 32 years old at the time of the hearing. (R. at 73).  Plaintiff was unmarried, but lived with her boyfriend. (R. at 22, 73)   Plaintiff had two children, ages 3 and 11. (R. at 26).  Plaintiff was a high school graduate and a certified nursing assistant ("CNA"). (R. at 26).  When Plaintiff last worked on or about June 1, 2001, she was employed as a CNA at a personal care home. (R. at 39).  Her employment allegedly ended due to a knee injury resulting from a fall down a flight of stairs. (R. at 39).

Beginning June 5, 2002, Plaintiff was seen by orthopedic doctor Owen A. Nelson, M.D. for left knee pain. (R. at 243).  Plaintiff claimed she fell down a flight of stairs a month before her visit. (R. at 243).  A magnetic resonance image ("MRI") taken of Plaintiff's left knee by a referring physician - Dr. Spinuzzi - indicated that Plaintiff suffered a torn ACL and bone contusion. (R. at 243).  Dr. Nelson could see no discernable swelling of the knee, instability, or

limitation in Plaintiff's range of motion. (R. at 243). There was tenderness over the proximal tibia both medially and laterally. (R. at 243). Dr. Nelson prescribed physical therapy and Vicodin. (R. at 243). Dr. Nelson also informed Plaintiff that once the Vicodin was used, Plaintiff would have to rely upon over-the-counter pain medications. (R. at 243). On June 21, 2002, Plaintiff contacted Dr. Nelson for a refill of her Vicodin. (R. at 2420. Dr. Nelson stated that Plaintiff would receive no more pain medication. (R. at 242).

Dr. Mitchell first examined Plaintiff on September 16, 2003. (R. at 166). Plaintiff complained of leg buckling and left knee pain. (R. at 166). Plaintiff claimed that the pain started after falling down a flight of stairs. (R. at 166). Dr. Mitchell noted that Plaintiff was initially seen for this issue by a Dr. Spinuzza. (R. at 166). Dr. Mitchell found that Plaintiff had a full range of movement in her left knee, with no instability, and that x-rays of the left knee showed no bone pathology. (R. at 166). Dr. Mitchell did find that Plaintiff exhibited some pain of her posterior joint line, and that Plaintiff was 10 degrees short of full extension of the left knee. (R. at 166). Plaintiff was considered markedly overweight, and Dr. Mitchell believed it contributed to her knee pain. (R. at 166). Dr. Mitchell recommended walking down the stairs backwards for physical therapy, and prescribed an anti-inflammatory medication. (R. at 166).

On October 28, 2003, Plaintiff had another appointment with Dr. Mitchell, complaining of left knee pain and buckling. (R. at 165). Dr. Mitchell found that the left knee showed no effusion or ligament damage, and had a full range of motion. (R. at 165). Plaintiff did exhibit some pain around the medial and lateral joint lines of her left knee. (R. at 165). Dr. Mitchell again recommended that Plaintiff walk down her stairs backwards for physical therapy, and prescribed a knee brace for stability. (R. at 165). Dr. Mitchell believed that Plaintiff had no desire to do a structured physical therapy program on her own, and did not appear to have an interest in controlling her weight, despite the fact that both of these activities would provide her with relief. (R. at 165).

On November 24, 2003, Plaintiff called her primary care physician, Joseph Labuda, M.D., requesting that a prescription for pain medication for her knee pain be refilled. (R. at 219). Dr. Labuda indicated in his notes that Plaintiff received Darvocet from Dr. Pressman. (R. at 219).

However, Dr. Labuda informed Plaintiff that he would not refill a prescription for narcotic when he had not examined Plaintiff's condition personally. (R. at 219).

On August 3, 2004, Plaintiff again contacted her primary care physician, Dr. Labuda, seeking prescription medication for her left knee pain. (R. at 217). Dr. Labuda would not prescribe narcotics for Plaintiffs pain unless he examined her first. (R. at 217). He suggested that Plaintiff contact an orthopedic doctor. (R. at 217).

Plaintiff returned to Dr. Mitchell on May 31, 2005, complaining of left knee pain due to another slip and fall a few weeks earlier. (R. at 164). Dr. Mitchell noted that he had previously given Plaintiff only a knee brace because he did not believe her condition to be severe enough to justify surgery. (R. at 164). Plaintiff was still notably overweight. (R. at 164). Dr. Mitchell observed that Plaintiff had no effusion or swelling of the left knee, and that x-rays showed no evidence of fracture or dislocation. (R. at 164). He diagnosed Plaintiff with a sprained lateral collateral ligament of the left knee. (R. at 164). Dr. Mitchel counseled Plaintiff to reduce her activity for six weeks, and prescribed her medication for her pain. (R. at 164). He felt that her left knee would heal nicely unless she re-injured it. (R. at 164).

At a follow-up on June 14, 2005, Dr. Mitchell noted that Plaintiff had been doing some exercises to treat her left knee, but was still exhibiting some soreness. (R. at 163). He could not find any other substantial problems with Plaintiff's left knee, except that he believed Plaintiff's excessive weight to be contributing to her discomfort. (R. at 163). Dr. Mitchell prescribed more Vicodin for periodic use and continued light physical therapy. (R. at 163).

On July 14, 2005, Plaintiff visited Dr. Mitchell complaining of deep aching in her left knee worsened by bad weather, standing up quickly, and walking up hill. (R. at 162). Dr. Mitchell found no organic cause for Plaintiff's alleged pain. (R. at 162). Plaintiff's left knee exhibited some signs of tenderness, but had a full range of motion, no ligament damage, and no atrophy. (R. at 162). Dr. Mitchell Diagnosed Plaintiff with chronic knee pain of undetermined etiology. (R. at 162). He recommended that Plaintiff reduce the use of narcotics for pain to five or seven pills a month, that Plainitff continue with light exercise, and that she use Aleve for regular pain. (R. at 162).

Plaintiff again saw Dr. Mitchell on August 31, 2005, complaining of chronic left knee pain worsened by prolonged walking and stair-climbing. (R. at 161). Dr. Mitchell found that most of the left knee pain was localized over the medial knee joint area. (R. at 161). He also found that Plaintiff's left knee had a full range of motion, showed no signs of atrophy, and showed no signs of ligament damage. (R. at 161). Plaintiff was diagnosed with chronic knee pain of undetermined etiology. (R. at 161). Dr. Mitchell could find little organic support for Plaintiff's claims of pain. (R. at 161). He recommended that Plaintiff reduce the use of narcotics for pain to five or seven pills a month, that Plainitff continue with light exercise, and that she use Aleve for regular pain. (R. at 161).

Plaintiff contacted her primary care physician, Dr. Labuda, on December 10, 2005, seeking prescription pain medication for her left knee. (R. at 219). Plaintiff claimed that a recent fall down eleven steps at her home worsened her left knee condition. (R. at 219). Dr. Labuda's notes do not indicate if any narcotics were prescribed at that date. (R. at 219).

January 17, 2006, Plaintiff visited Dr. Mitchell after allegedly falling down several stairs and hitting her left knee. (R. at 160). Plaintiff claimed increased pain, but Dr. Mitchell noted no swelling, no atrophy, no ligament damage, and a full range of motion in the left knee. (R. at 160). Dr. Mitchell opined that there was not much organic support for Plaintiff's claims of pain, and that Plaintiff was not complying with her physical therapy program. (R. at 160). As a result, Dr. Mitchell determined that he would prescribe fewer pain medications for Plaintiff. (R. at 160).

Plaintiff was examined by orthopedic surgeon Ari Pressman, M.D. on February 23, 2006. (R. at 195). Plaintiff complained of left knee pain which worsened when she walked, stood up, and used the stairs. (R. at 195). Dr. Pressman observed some tenderness along the patellar tendon, but found Plaintiff's left knee to have a full range of motion. (R. at 195). An x-ray showed mild to moderate arthritis in the left knee. (R. at 195). Dr. Pressman believed Plaintiff suffered from mild degenerative symptoms and patellar tendonitis. (R. at 195). He recommended physical therapy, anti-inflammatory medication, and analgesic medication, as needed. (R. at 195).

Plaintiff returned to Dr. Mitchell's office on March 16, 2006, complaining that her left knee pain had not abated since her last visit with him. (R. at 158). Dr. Mitchell's findings were

unchanged from the previous visit with Plaintiff. (R. at 158). He diagnosed Plaintiff with chronic knee pain of undetermined etiology, and could find little organic support for Plaintiff's complaints of pain. (R. at 158). Dr. Mitchell recommended that Plaintiff reduce the use of narcotics for pain to five or seven pills a month, that Plainitff continue with light exercise, and that she use Aleve for regular pain. (R. at 158).

Plaintiff was examined by orthopedic surgeon Selim El-Attrache, M.D. on April 18, 2006, due to complaints of left knee and leg pain allegedly resulting from a fall down a flight of stairs in 2001. (R. at 151). Dr. El-Attrache acknowledged that Plaintiff was initially treated by Dr. Mitchell. (R. at 151). Dr. El-Attrache determined that Plaintiff's symptoms were indicative of left knee tenosynovitis and internal derangement. (R. at 151). He noted that Plaintiff's left knee was painful and tender. (R. at 151). Dr. El-Attrache believed that Plaintiff's marked obesity was contributing to her left knee pain. (R. at 151). Moreover, Plaintiff's obesity precluded her candidacy for surgical intervention. (R. at 151). Dr. El-Attrache believed that conservative management of the left knee would serve Plaintiff best. (R. at 151). Plaintiff was prescribed Vicodin and Motrin for her pain, and referred back to Dr. Mitchell. (R. at 151-52).

Plaintiff was again seen by Dr. El-Attrache on April 24, 2006. (R. at 149). Plaintiff continued to complain of left knee pain and swelling, as well as limitation of motion, and sought stronger pain medication. (R. at 149). She was diagnosed as suffering from left knee tenosynovitis and mild effusion. (R. at 149). Dr. El-Attrache explained that Plaintiff was still not a candidate for surgery due to her weight, and that she should consider gastric bypass surgery. (R. at 149). He then prescribed her Vicodin ES for her pain. (R. at 149).

Following a May 25, 2006, appointment with Plaintiff, during which Plaintiff claimed that her left knee was frequently giving out, Dr. Pressman determined that Plaintiff suffered from an ACL deficient left knee and recommended ACL reconstruction. (R. at 193). Plaintiff stated that she was considering gastric bypass surgery first, and would contact Dr. Pressman if she wished to have the ACL reconstruction done. (R. at 193).

On July 13, 2006, Plaintiff was examined by Dr. Mitchell because she claimed that she was no longer able to do her therapeutic exercises. (R. at 157). Plaintiff claimed she could do

little housework and spent much of her time sitting. (R. at 157). Dr. Mitchell noted Plaintiff's belief that her milder narcotics were not treating her pain, and that she requested stronger narcotics. (R. at 157). Plaintiff was diagnosed with chronic knee pain of undetermined etiology, and Dr. Mitchell recommended that Plaintiff reduce the use of narcotics for pain to five or seven pills a month, that Plainitff continue with light exercise, and that she use Aleve for regular pain. (R. at 157). Dr. Mitchell's findings regarding Plaintiff's knee condition were unchanged, and he stated that there was little organic support for Plaintiff's claims of pain. (R. at 157).

David R. Sheba, D.O. examined Plaintiff on November 28, 2006. (R. at 206). Plaintiff went to Dr. Sheba claiming pain, stiffness, and swelling in the left knee. (R. at 206). Plaintiff claimed that the onset of her pain was six months ago and that no therapy had been done. (R. at 206). Plaintiff stated that her pain was worsened by climbing stairs and squatting. (R. at 206). She had no feelings of numbness or tingling. (R. at 206). Dr. Sheba found no swelling or atrophy, and mild tenderness. (R. at 206). He also found no evidence of instability. (R. at 206). Plaintiff was prescribed Naprosyn, and Dr. Sheba instructed Plaintiff to lose weight to relieve the strain on her left knee. (R. at 206).

The following day, November 29, 2006, Plaintiff contacted Dr. Sheba's office. (R. at 236). Plaintiff stated that Dr. Sheba had prescribed Naprosyn for her arthritis, but that she would like a prescription for pain medication - specifically, Darvocet. (R. at 236). Plaintiff was informed that she could take Tylenol with the Naprosyn for her pain, and moreover, that Plaintiff had arthritis and should use arthritis medication, not Darvocet. (R. at 236).

Plaintiff was referred by her primary care physician, Dr. Labuda, to Jefferson Pain and Rehabilitation Center, where Plaintiff was examined by Stephanie Hahn Le, M.D. (R. at 204 - 05). On December 12, 2006, Dr. Le wrote Dr. Labuda a report of her findings regarding Plaintiff's left knee. (R. at 204 - 05). Dr. Le noted that Plaintiff's chief complaint is knee pain resulting from a fall in 2001. (R. at 204). Dr. Le noted that despite severely spraining the supporting ligaments in her left knee and also her patella, none of the doctors with whom Plaintiff had conferred recommended surgery, though her physical therapy did not seem to control her pain and she claimed to take either Vicodin or Percocet twice a day to manage pain.

(R. at 204). Plaintiff claimed she suffered numbness, tingling, weakness, morning stiffness, discouragement, and sleep disturbance. (R. at 204). Forceful use, lifting, standing, walking, sitting, and the weather allegedly worsened her pain. (R. at 204). Dr. Le noted Plaintiff's claimed inability to lift grocery bags; bend; lift from floor-to-waist and waist-to-shoulders; lift above the shoulder; push and pull; use her hands and open doors and jars; kneel; and, climb stairs and ladders. (R. at 204). After examining the condition of Plaintiff's left knee, Dr. Le determined that Plaintiff was not a candidate for surgery. (R. at 205). Plaintiff was diagnosed by Dr. Le as having knee pain secondary to ligamentous strain. (R. at 205). Dr. Le prescribed Vicodin for Plaintiff's pain. (R. at 205). Dr. Le opined that because Plaintiff was not a candidate for surgery, because Dr. Le's clinic did not practice management of long-term narcotic usage for pain, and because Plaintiff claimed that physical therapy and cortisone shots provided no relief for her pain, the clinic could not provide Plaintiff with further help. (R. at 250).

On December 20, 2006, Plaintiff phoned Dr. Sheba's office seeking pain medication for her left knee pain. (R. at 235). Dr. Sheba asked if Plaintiff had gone to Dr. Le at the pain clinic. (R. at 235). Plaintiff replied that she had, and that Dr. Le had prescribed pain medication. (R. at 235). Dr. Sheba informed Plaintiff that she could not receive pain medications from the pain clinic and his offices, and his earlier treatment notes showed that he had never provided Plaintiff with pain medications, only arthritis medication. (R. at 235). Dr. Sheba advised Plaintiff to go back to Dr. Le if she wanted pain medication. (R. at 235).

Plaintiff contacted Dr. Sheba on January 26, 2007. (R. at 234). Plaintiff informed Dr. Sheba that Dr. Le was not able to provide Plaintiff with care, and Plaintiff was unsure of what to do. (R. at 234). Dr. Sheba counseled Plaintiff to continue taking arthritis medication and stick to her physical therapy routine. (R. at 234).

Plaintiff visited Dr. Pressman again on February 28, 2007, complaining that her left knee gave out on her on a daily basis. (R. at 192). Dr. Pressman noted that Plaintiff had been trying to care for her two year old son and was substantially limited by her left knee. (R. at 192). Dr. Pressman determined that Plaintiff was suffering from an ACL tear, a medial meniscal pathology, and a medial chondral injury. (R. at 192). He again recommended Plaintiff undergo

ACL reconstruction, and Plaintiff stated that she would contact Dr. Pressman if she wished to proceed with the surgery. (R. at 192).

Plaintiff returned to see Dr. Mitchell on October 30, 2007. (R. at 250). He determined that Plaintiff's left knee had deteriorated significantly since 2006. (R. at 250). Dr. Mitchell could find no evidence indicating the cause of the rapid degeneration. (R. at 251). Plaintiff requested pain medication, but Dr. Mitchell declined because he did not feel comfortable prescribing pain medication to her. (R. at 251). Dr. Mitchell advised Plaintiff to seek another opinion if she wanted to continue taking narcotics. (R. at 251). He also stated that because he could not determine the cause of her left knee degeneration, he did not know how to further treat it, and he suggested seeking a second opinion. (R. at 251).

Dr. Mitchell examined Plaintiff again on November 13, 2007, because of left knee aggravation due to "total care" of an individual in her home. (R. at 249). Dr. Mitchell determined that the left knee joint space had largely collapsed and her bones were rubbing together. (R. at 249). He believed that her obesity contributed to her condition, but that even with weight loss she would have issues with pain. (R. at 249). Dr. Mitchell prescribed  pain medications and anti-inflammatory medication. (R. at 249). He indicated that Plaintiff's work status was "as tolerated." (R. at 249).

On November 21, 2007, Plaintiff was examined by Dr. Nelson for left knee pain and swelling. (R. at 232). Plaintiff explained to Dr. Nelson that the pain and swelling began suddenly, two weeks earlier. (R. at 232). Plaintiff claimed that her knee was unstable and she could not climb stairs. (R. at 232). She stated that a fall caused her pain. (R. at 232). Dr. Nelson indicated that Plaintiff was morbidly obese, her left knee had only minor swelling, and her legs exhibited no signs of atrophy. (R. at 232). He noted that there was 1+ effusion in the left knee joint, but that there was no tenderness present. (R. at 232). Plaintiff's left knee showed some instability, but had a normal range of motion and full strength. (R. at 233). Plaintiff had an antalgic gait and favored her left side. (R. at 233). Dr. Nelson continued Plaintiff on Naprosyn for her pain, and ordered an MRI of her left knee, a knee brace, and physical therapy. (R. at 233).

Dr. Mitchell examined Plaintiff's left knee on December 4, 2007. (R. at 246). Plaintiff's

pain was noted as 5 on a scale of 1 to 10. (R. at 246). Plaintiff claimed she could not use her left knee for more than forty minutes, weight bearing increased her pain, she could not squat, she could ride in a car for only thirty minutes, pain would radiate up her left leg, the left knee would grind when used, the knee felt weak, cold weather worsened the pain, she could not carry grocery bags, and walking uphill increased her pain. (R. at 246). Dr. Mitchell noticed Plaintiff experienced pain on palpation, she lost 5 degrees of extension and 20 degrees of flexion, and a small effusion was present. (R. at 247). Plaintiff also exhibited mild atrophy of her quadriceps, difficulty standing on heel and toe, inability to squat fully, and gait antalgia without a limp. (R. at 247). Dr. Mitchell felt that Plaintiff's pain was corroborated by his physical findings. (R. at 248). He diagnosed Plaintiff with post traumatic synovitis of the left knee, post traumatic patello-femoral syndrome, and post traumatic meniscal derangement residuals. (R. at 248). Plaintiff's work status was identified as "none." (R. at 248). Dr. Mitchell recommended stretching, leg lifts, walking backwards down stairs, utilizing a transcutaneous electrical nerve stimulation ("TENS") unit, and wall slides. (R. at 248).

Plaintiff was again seen by Dr. Mitchell on January 15, 2008 for left knee pain. (R. at 244). Plaintiff claimed that her pain was ranked 7 on a scale of 1 to 10. (R. at 244). She also claimed that she had a persistent ache which worsened when using stairs, that her left knee felt weak and buckled, that her pain worsened in cold weather, and that her left knee swelled by the end of every day. (R. at 244). Dr. Mitchell noted that at the examination, Plaintiff's left knee exhibited tenderness and mild effusion, but no swelling. (R. at 244). Plaintiff's knee extension was 180 degrees, and her flexion was 110 degrees. (R. at 244). Mild atrophy of Plaintiff's quadriceps was noted, and Plaintiff could not lift her left leg to full extension. (R. at 245). Dr. Mitchell diagnosed Plaintiff with post traumatic synovitis of the left knee, post traumatic patello-femoral syndrome, and post traumatic meniscal derangement residuals. (R. at 245). Dr. Mitchell recommended Plaintiff use a TENS unit to reduce her left knee pain. (R. at 245). He also suggested that Plaintiff avoid pain inducing activities and work on knee stretching to increase her range of motion. (R. at 245). Dr. Mitchel identified Plaintiff's work status as "none." (R. at 245).

Dr. Mitchell completed a Residual Functional Capacity Assessment ("RFC") of Plaintiff on August 4, 2006. (R. at 155-56). In the RFC, Dr. Mitchell concluded that Plaintiff could frequently lift up to twenty five pounds, and could occasionally lift up to fifty pounds. (R. at 155). Plaintiff was also considered to be capable of standing and walking for six or more hours a day, and could sit eight hours a day if able to alternate her position. (R. at 155). Plaintiff showed some limitation with - but could frequently perform - bending, kneeling, stooping, crouching, balancing, and climbing. (R. at 156). Dr. Mitchell believed that Plaintiff had no other limitations. (R. at 155-56).

A State Agency consultant, Denise Gault, also completed a Physical RFC of Plaintiff on November 13, 2006. (R. at 113 - 119). Ms. Gault adopted the limitations findings of Dr. Mitchell from his August 9, 2006 evaluation of Plaintiff. (R. at 119). With respect to Plaintiff's knee, Ms. Gault found a medically determinable impairment of left knee tenosynovitis. (R. at 118). Plaintiff's station and gait were determined to range from slightly antalgic with swelling, to normal. (R. at 118). Ms. Gault found that for her knee, Plaintiff was prescribed only routine, conservative physical therapy treatment, and medications which appeared to effectively control the symptoms of her condition. (R. at 118). However, Ms. Gault recognized that the etiology of Plaintiff's knee condition had not been determined. (R. at 118).

Ms. Gault noted that Plaintiff was able to care for young children and maintain her home despite her knee condition. (R. at 118). Plaintiff was also found to be capable of driving a car and walking without assistance. (R. at 118). Specifically, Ms. Gault determined that Plaintiff could occasionally lift fifty pounds, frequently lift twenty five pounds, sit and walk approximately six hours of an eight hour work day, sit approximately six hours of an eight hour work day, and was not limited in her ability to push and pull. (R. at 114). Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and suffered no manipulative, visual, or communicative limitations. (R. at 115 - 16). According to Ms. Gault, Plaintiff would need to avoid extreme cold, extreme heat, wetness, humidity, and heights. (R. at 116). In light of these observations, and consistent with the findings presented in Dr. Mitchell's RFC assessment, Ms. Gault determined Plaintiff to be capable of maintaining employment. (R. at 119).

At the hearing held on February 4, 2008, Plaintiff testified that she was disabled due to severe pain in her left knee. (R. at 27). Plaintiff stated that her left knee would occasionally give out, and that her pain prevented her from walking at a fast pace, standing, and sitting for long periods. (R. at 27). Plaintiff testified that she required a cane for walking. (R. at 27).

The ALJ inquired as to why Plaintiff had not sought surgical treatment. (R. at 28). Plaintiff explained that the first time she was recommended for ACL reconstruction by Dr. Pressman, she was not able due to a pregnancy. (R. at 28). After the pregnancy, she testified that she sought second opinions because she was worried about the potential risks of having the operation. (R. at 28). Plaintiff then stated that it was a good thing she had not gone through with the ACL reconstruction, because her left knee had continued to deteriorate, and Dr. Mitchell allegedly recommended a full knee replacement on or about the 13th or 14th of November, 2007. (R. at 28). Plaintiff explained to the ALJ that she was still unsure as to whether she wanted a knee replacement due to potential health risks. (R. at 28 - 29). The ALJ asked Plaintiff about the treatments she received in lieu of surgery. (R. at 29). Plaintiff testified that she used a TENS unit three times a day for pain relief. (R. at 29). She also explained that she did water therapy on her own. (R. at 29).

Plaintiff stated to the ALJ that her left knee had good days and bad days. (R. at 29). On a bad day, she testified that she would sit in a recliner all day with her leg propped up. (R. at 29). On those days, she relied upon her mother and sister who resided nearby, as well as her live-in boyfriend, for help. (R. at 29). Plaintiff testified that she could sit for up to twenty minutes, that she could walk slowly for five to twenty minutes, and that she could stand for ten to fifteen minutes. (R. at 30). Engaging in any of these activities beyond those times caused Plaintiff's left knee to tighten and feel uncomfortable. (R. at 31). Coldness also made the pain and discomfort in Plaintiff's left knee worse. (R. at 32). Plaintiff testified that she could probably lift ten to fifteen pounds while either standing or sitting. (R. at 31).

At the hearing, Plaintiff stated that she was five feet, six inches tall, and weighed 275 pounds. (R. at 31). She acknowledged that she needed to lose weight. (R. at 31). Plaintiff testified that she took Percocet, Naprosyn, and Lidoderm for her left knee. (R. at 32). Her daily

routine included getting up in the morning to care for her three year old son, though she often received help from her mother and eleven year old son. (R. at 33). Depending on how painful her left knee was, Plaintiff explained that some days she could do more than she could on other days. (R. at 33). Plaintiff testified that - depending upon her pain - she sometimes washed the dishes, cooked dinner, did the grocery shopping, drove, and went to the mall. (R. at 34). Plaintiff stated that she also maintained a fish tank and her children's ferret. (R. at 34).

Plaintiff testified that getting dressed was often complicated because she had difficulty lifting her left leg to put on pants. (R. at 34). Bathing was often problematic, and Plaintiff testified that she used a bathing chair when she showered. (R. at 35). Plaintiff explained that she sometimes visited with her mother and grandmother, both of whom live nearby. (R. at 35). Plaintiff stated that she tried to attend church every Sunday, went out to fast food restaurants occasionally, saw movies, and otherwise stayed at home, read books, and watched television. (R. at 36).

Plaintiff's attorney asked her to explain her pain a little further. (R. at 39). Plaintiff testified that it began after she fell down a flight of stairs. (R. at 39). Plaintiff stated that when she did not wear a prescription patch to the numb her left knee, her pain could come and go, or persist for an entire day. (R. at 39). She stated that she had pain while sitting for the hearing. (R. at 39). Plaintiff testified that her pain prevented her from sleeping soundly, and often required her to prop up her legs in bed, or get up and walk around. (R. at 40). She also testified that she no longer slept in the upstairs portion of her house, but on her couch, because the stairs were too difficult for her. (R. at 40).

The vocational expert, Mr. Ganoe, was present to testify regarding employment opportunities available to Plaintiff. (R. at 40). The ALJ asked Mr. Ganoe if there would be a significant number of jobs available to a hypothetical person of the same age, education, and experience as Plaintiff, limited to light work, and requiring: the ability to change positions at least every half hour; no ladders, ropes, scaffolds, stairs, or ramps; no more than occasional balancing, stooping, or crouching; no kneeling or crawling; no exposure to extreme heat, cold, wetness, or humidity; the ability to use a cane to walk more than 20 yards; and, no standing or

walking for more than approximately four hours in a total work day.

Mr. Ganoe testified that a hypothetical individual with such restrictions would be eligible to work as: a ticket taker, of which there were 54,500 jobs in the national economy; price marker, of which there were 159,500 jobs in the national economy; general office clerk, of which there were 299,000 jobs in the national economy; and, call-out operator, of which there were 79,700 jobs in the national economy. (R. at 42). Mr. Ganoe further stated that these were just a sampling of the jobs available to the hypothetical person. (R. at 42). The ALJ asked how many absences per month would be tolerated in such positions, to which Mr. Ganoe replied that one or two days a month would likely be acceptable. (R. at 43). The ALJ also asked if the jobs would still be available if the hypothetical person needed to lay flat or in a recliner at least twice a day to elevate his or her legs for thirty minutes. (R. at 43). Mr. Ganoe testified that the listed jobs would likely not be available under such circumstances. (R. at 43). Plaintiff's attorney asked Mr. Ganoe if the listed jobs would still be available if the hypothetical person was off-task for one third of the work day as a result of chronic knee pain. (R. at 43). Mr. Ganoe replied that the jobs would likely not be available under such circumstances. (R. at 43).

In his decision dated July 1, 2008, the ALJ found:

1. The [Plaintiff] has not engaged in substantial gainful activity since June 7, 2006, the application date;
2. The [Plaintiff] has the following severe impairments: left knee deterioration; migraines; and obesity;
3. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;
4. After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) with the ability to briefly (one to two minutes) change positions at least every thirty minutes; no climbing ladders, ropes, scaffolds, stairs or ramps; no more than occasional balancing, stooping or crouching; no kneeling or crawling; no exposure to extremes of heat, cold, wetness or humidity; must be able to use a cane for any walking more than about 20 yards; no standing or walking more than four hours total in a day; and must be able to miss up to one day of work per month;
5. The [Plaintiff] has no past relevant work;
6. The [Plaintiff] was born on September 25, 1975 and was 30 years old, which is defined as a younger individual age 18-44, on the date the application was filed;
7. The [Plaintiff] has at least a high school education and is able to communicate in English;

14

8.    Transferability of job skills is not an issue because the [Plaintiff] does not have past relevant work;

9.    Considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform; and,

10.   The [Plaintiff] has not been under a disability, as defined in the Social Security Act, since June 7, 2006, the date the application was filed.

(R. at 13 - 19). Accordingly, the ALJ determined that Plaintiff was not entitled to SSI under the Act. (R. at 19).

## IV.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3).[3] Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based.

When reviewing a decision denying SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

---

[2]

Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]

Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir.

1986).

## V.   DISCUSSION

In her Motion for Summary Judgment, Plaintiff attacks the determination of the ALJ with respect to the severity of her left knee pain, and not her migraines.  The Court's discussion is accordingly limited.  Plaintiff argues, first, that the ALJ erred in failing to accord Dr. Mitchell's medical opinions greater weight, in particular, his conclusions in later examinations that Plaintiff was unable to work.  Secondly, Plaintiff argues that the ALJ's determination was improper because he failed to accord Plaintiff's subjective complaints of knee pain sufficient weight..  Had the ALJ appropriately considered these issues, Plaintiff contends that she would have been entitled to SSI.

In response, Defendant argues that Dr. Mitchell's conclusions regarding Plaintiff's ability to work were both internally inconsistent with his treatment notes, and inconsistent with the notes of other physicians in the record, and therefore, were accorded proper weight by the ALJ.  As to the subjective complaints of pain, Defendant contends that it is the ultimate responsibility of the ALJ to make credibility assessments, and that in light with the conflict between Plaintiff's subjective complaints and the objective record, Plaintiff's complaints were entitled to little weight.[4]  In sum, Defendant asserts that the ALJ's decision was properly based upon substantial evidence.

Plaintiff argues that when the ALJ made his decision, he improperly substituted his own judgment for that of Dr. Mitchell, and failed to consider and account for the Plaintiff's knee condition as described in Dr. Mitchell's notes in 2007 and 2008. Plaintiff also argues that Dr.

---

[4]

   Defendant also argues that alleged substance abuse by Plaintiff diminishes the credibility of Plaintiff's subjective complaints of pain and limitation, because the complaints were made in an attempt to receive prescription narcotics. (Docket No. 12 at 1).  The ALJ made no mention of substance abuse by Plaintiff in his reasoning, and neither did he make factual findings based upon substance abuse by Plaintiff. (R. at 11 - 19).  Thus, the Court will not discuss Defendant's speculation regarding drug abuse by Plaintiff, as the Court is confined to analyzing those arguments and facts presented by the ALJ to justify his decision denying SSI.  *Palmer*, 995 F.Supp. at 552; *see also Monsour Medical Center*, 806 F.2d at 90-91.

Mitchell's conclusion that Plaintiff could not work[5] should have been considered because it was supported by objective medical findings. Defendant counters that the ALJ, alone, makes the ultimate determination of disability, and his denial of benefits was supported by substantial evidence from the record.

The Court of Appeals for the Third Circuit had held that a treating physician's opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

While it is not expected that the ALJ's explanation match the rigor of "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, it is expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure

---

[5]

The Court is not convinced that Dr. Mitchell actually made such a finding. In the Record, Dr. Mitchell noted Plaintiff's "work status" on three occasions: November 13, 2007; December 4, 2007; and, January 15, 2008. (R. at 245, 248, 249). At the first examination, Dr. Mitchell noted Plaintiff's status was, "as tolerated." (R. at 249). In the subsequent two examinations, Plaintiff's status was, "none." (R. at 245, 248). It is unclear whether Dr. Mitchell was referring to Plaintiff's capacity to work, or whether he was commenting on the state of Plaintiff's employment. The use of the heading, "work status," does not appear to suggest that Dr. Mitchell was making a disability determination. However, given that the ALJ recognized these statements as indicating that Dr. Mitchell believed Plaintiff was unable to work, the Court will treat the statements as such. (R. at 17).

speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, the determination of disabled status for purposes of receiving SSI - a decision reserved for the Commissioner, only - will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 416.927(e).

In conducting his RFC assessment of Plaintiff's ability to work, the ALJ found that in order for Plaintiff to hold employment, she required the ability to briefly (one to two minutes) change positions at least every thirty minutes; the ability to avoid climbing ladders, ropes, scaffolds, stairs or ramps; the ability to avoid more than occasional balancing, stooping or crouching; the ability to avoid kneeling or crawling; the ability to avoid exposure to extremes of heat, cold, wetness or humidity; the ability to use a cane to walk more than about 20 yards; the ability to avoid standing or walking more than four total hours in a day; and the ability to miss up to one day of work per month. (R. at 16). The vocational expert at Plaintiff's hearing found that even with such limitations, jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 40 - 43).

The only RFC assessment completed by Dr. Mitchell was in August of 2006. (R. at 155 - 56). The ALJ noted that the assessment stated that Plaintiff could stand or walk in combination six or more hours of an eight hour workday. (R. at 14). He also noted that Plaintiff could sit eight hours of an eight hour workday if allowed the ability to alternative positions. (R. at 14). Dr. Mitchell never conducted another RFC assessment, despite the fact that he believed Plaintiff's left knee had deteriorated since 2006. (R. at 15, 249 - 51). Dr. Mitchell made no subsequent limitations findings that contradicted those made in his RFC assessment in 2006. (R. at 17, 249 - 51). The closest that Dr. Mitchell came to making another RFC assessment was during his last few treatment sessions with Plaintiff, wherein Dr. Mitchell indicated Plaintiff's "work status" was "as tolerated," November 13, 2007, and "none," December 7, 2007 and January 15, 2008. (R. at 244 - 249).

The ALJ interpreted these findings as conclusions by Dr. Mitchell that Plaintiff could no longer work. (R. at 17). The ALJ rejected these conclusions, stating that not only was this determination reserved to him, alone, but also that such conclusions were inapposite to the record

as a whole - specifically Dr. Mitchell's other medical notes. (R. at 17). The ALJ noted that despite Plaintiff's complaints to Dr. Mitchell of severe limitations, she was advised to continue physical therapy exercises, such as walking down the stairs backwards. (R. at 15). In November of 2007, during the same time span in which Plaintiff had her final examinations with Dr. Mitchell, Dr. Nelson indicated Plaintiff's station and posture were normal, her gait was antalgic and favoring her left, she had a +1 effusion of the left knee, showed no signs of atrophy, had normal muscle strength, and exhibited normal tone. (R. at 14). The ALJ opined that Dr. Mitchell's earlier RFC assessment indicated Plaintiff had the ability to perform more than sedentary work. (R. at 17). Finally, the ALJ looked to the RFC assessment of the State Agency consultant - Ms. Gault - which stated that based upon Plaintiff's medical history she was eligible for medium work. (R. at 17). In fact, the ALJ considered this RFC to over-estimate Plaintiff's eligibility for work. (R. at 17).

While the opinions of a treating physician are to be accorded great weight, that is not the case with conclusions with respect to ability to work. *Brownawell*, 554 F.3d at 355; 20 C.F.R. § 416.927(e). The only conclusion made by Dr. Mitchell that the ALJ explicitly rejected was that Plaintiff could not work. (R. at 17). Otherwise, the ALJ made extensive citations to Plaintiff's treatment record for left knee pain when creating an RFC assessment of her limitations. (R. at 14 - 15). Based upon the support cited by the ALJ from the record, and Plaintiff's failure in her Motion for Summary Judgment to provide evidence contradicting the basis of the ALJ's RFC assessment, the Court finds that substantial evidence underlaid the ALJ's determination of Plaintiff's ineligibility for SSI.

Plaintiff argues in her Motion that the ALJ failed to consider her subjective complaints of pain. She asserts that because Dr. Mitchell acknowledged that her complaints of pain were corroborated by objective medical findings, that her pain is severe enough to make her eligible for SSI. Defendant counters that the ALJ has deference when assessing the credibility of subjective complaints of pain, and need not accept such complaints as evidence of disability. Further, Defendant argues that the ALJ cited specific evidence to support his contention that the Plaintiff was exaggerating the severity of her pain and limitations.

An ALJ should accord subjective complaints of pain the same treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). Moreover, there need not be objective evidence of a subjective complaint, and the ALJ must explain his rejection of same. *Id.*; *Burnett*, 220 F.3d at 122. When medical evidence provides objective support for subjective complaints of pain, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. Even when an ALJ has personally observed a claimant, personal observations may not be the sole basis for rejecting subjective complaints of pain. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)).

The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints of pain. *Id.* However, while pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.

The ALJ stated that he believed the Plaintiff's claims of pain and limitation to be exaggerated. (R. at 17). The ALJ found that although Plaintiff complained that she could not lift more than fifteen pounds, sit more than twenty minutes, or stand more than fifteen minutes, Plaintiff managed to care for a three year old child, maintain a fish tank, and care for a pet ferret. (R. at 17). Plaintiff also managed to attend church regularly, go to movies, read, watch television, and take her children to fast food restaurants. (R. at 17). Furthermore, while Dr. Mitchell found that Plaintiff's complaints were corroborated by her medical condition in her last few sessions with him, the ALJ noted that Dr. Mitchell continued to maintain her on the same course of physical therapy that included, amongst other activities, walking backwards down a set

of stairs for exercise. (R. at 15).  The ALJ  accommodated many of Plaintiff's subjective complaints in his RFC assessment - adding exertional, postural, and functional limitations consistent with certain of Plaintiff's alleged symptoms. (R. at 17).

However, while he determined that Plaintiff's subjective complaints could reasonably result from Plaintiff's medically identified knee condition, with some support to back her complaints of pain in Dr. Mitchells' notes, the ALJ found that Dr. Mitchell's own approach to treating Plaintiff's knee condition mitigated the severity of Plaintiff's complaints. (R. at 17). Those complaints the ALJ found credible after he contrasted the complaints with the record were incorporated into his RFC assessment. (R. at 17).  As such, the Court finds that the ALJ weighed Plaintiff's subjective complaints properly, and his decision was supported by substantial evidence.

## VI.    CONCLUSION

Based upon the foregoing, the Court finds that the ALJ's treatment of Dr. Mitchell's medical opinions and Plaintiff's subjective complaints of pain was supported by substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.  An appropriate Order follows.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Gregory T. Kunkel, Esquire
       Kunkel & Fink, LLP
       Suite 206
       Brentwood Professional Building
       4411 Stilley Road
       Pittsburgh, PA 15227

       Jessica Smolar, AUSA
       United States Attorney's Office
       Suite 4000
       U.S. Post Office & Courthouse
       700 Grant Street
       Pittsburgh, PA 15219